**Ike MONT–ROS, Plaintiff,**

**v.**

**CITY OF WEST MIAMI, Defendant.**

**No. 98–2919–CIV.**

United States District Court,
S.D. Florida.

July 11, 2000.

Carlos Garcia, Garcia & Dominguez, P.A., Miami, FL, for plaintiff.

Richard McDuff, Kindy K. Coogler, Johnson, Anselmo, Murdoch, Burke & George, P.A., Ft. Lauderdale, FL, for defendant.

### *ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

GOLD, District Judge.

### I. Statement of Facts[1]

Plaintiff, Ike Mont–Ros, is a 46–year–old, obese male, who was hired by the City of West Miami in 1986 as a police officer.

---

1. The following statement of facts are taken verbatim from defendant's concise statement of material facts as to which there is no genuine issue to be tried. Plaintiff has completely failed to follow Local Rule 7.5. Specifically, plaintiff failed to submit a concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried. At the beginning of his memorandum of law, plaintiff submits what amounts to

(A1–p.22).[2] The City of West Miami Police Department employs a total of fifteen (15) police officers, including the Chief, and three (3) communications officers/dispatchers. These positions are allotted for in the annual operations budget for the City of West Miami Police Department. (A6–1). Pursuant to the City of West Miami's Police Department Rules and Regulations, the duties and responsibilities of police officers include: "... prevention of crime, the protection of life and property, the apprehension and arrest of violations of the criminal and traffic laws, recovery of stolen property and maintain peace." (A9)

While he was working for the City, Plaintiff was diagnosed with a condition known as obstructive sleep apnea. (A1–p.37) Obstructive sleep apnea is a condition that occurs often in people who are obese and, according to Plaintiff's treating doctors, is treatable with weight loss, the use of a CPAP/BiPAP (Continuous/Bi–Positive Air Pressure) machines and/or uvulopalatopharyngoplasty surgery. (A4–p. 6; A5–pp. 10–12). Sleep apnea is treatable and can be corrected with either of the following: (1) weight loss, (2) use of a nasal CPAP machine, and/or (3) the UPPP surgical procedure (uvulopalatopharyngoloplasty). (A4–pp. 7–1; A5–12, 24). Plaintiff's treating doctors, Gonzalez and Pimentel, concur that his sleep apnea condition is directly related to his obesity; and, that with a weight reduction program and the use of a nasal CPAP machine, Plaintiff's sleep apnea condition and the resulting daytime drowsiness can be alleviated. (A4–p. 7, 1.5; A5–pp. 12, 24). Dr. Hugo Gonzalez, Plaintiff's pulmonologist, testified that, much like the use of glasses to correct ones vision, the use of the nasal CPAP machine at night will alleviate Plaintiff's condition during sleeping hours and, thus, reduce the daytime drowsiness. (A4–pp.28–29). Dr. Pimentel, Plaintiff's primary care doctor, testified that she did not believe Plaintiff's sleep apnea condition substantially limited or prevented him from working as a police officer. (A5–p.27). Doctors Gonzalez and Pimentel agree that Plaintiff's sleep apnea condition will persist, without the use of the CPAP, regardless of what shift Plaintiff works. (A4–p 23; A5–p. 16, 1.4).

Since his diagnosis, Plaintiff worked at the City of West Miami as a police officer assigned to road patrol and, in addition to his regular duties as a police officer, as assistant firearms instructor in 1996 and firearms instructor in 1997. (A1–pp.22, 30–32) Plaintiff was also instrumental in the creation, operation, and teaching of a jujitsu program sponsored by the City called, "Cops, Kids and Kicks," from 1993 until 1998. (A1–p.32). On or about April 4, 1996, Plaintiff was involved in a motor

---

a one page recitation of the allegations in his complaint with citations only to his complaint. Plaintiff's complaint is not evidence and does not serve to create disputed issues of fact. Because plaintiff has failed to cite to evidence in the record to show the court precisely where the disputed issues are found, the court is entitled under Local Rule 7.5 to deem admitted all of the facts contained in defendant's statement. Nonetheless, in the interests of deciding the case on the merits, the court has conducted an exhaustive, independent review of the entire record. Based on this review, the court concludes that defendant's statement of facts accurately states the material issues of fact which are undisputed in the record. Finally, the court notes that plaintiff's brief is extremely difficult to follow.

All of plaintiff's arguments are grouped together under one heading labeled "Analysis" with no clear demarcation between the parts of his argument. The plaintiff does cite to the record in his "Analysis," and to the extent possible, the court has endeavored to compare plaintiff's facts in his brief to the defendant's statement of facts to ascertain whether plaintiff is contending that disputed issues of fact exist.

**2.** The record evidence supporting the factual references are contained in defendant's appendix in support of motion for final summary judgment, using the following reference symbol: (A. [item no.]-[page or exhibit number] ).

vehicle accident in which he sustained an injury to his right knee which required arthroscopic surgery. (A1–pp.45). On or about April 30, 1997, Plaintiff was involved in another accident where he injured his left knee and required arthroscopic surgery to repair a meniscus tear. (A1–p. 45–47; A3–p. 19) As a result of his left knee injury, Plaintiff was out on worker's compensation leave from the time the injury occurred on April 27, 1997, until May 20, 1997, when he was released by his treating orthopedic physician, Daniel Kalbac, M.D., to light duty work at the City. (A1–p. 57; A6)

Plaintiff was assigned light duty work as a fill-in dispatcher to work dispatch shifts that were open due to the shortage of personnel because of scheduled days/nights off. (A6; A8; A1–pp. 57–60) Plaintiff admitted in his deposition that communications officers or "dispatchers" are not police officers. (A6; A8; A1–p. 57) They are civilian employees whose duties and responsibilities include the following: "dispatch police officers to crime, crash, and request for service calls and maintain contact: perform police clerical duties ..." (A6; A10; A1–p. 57, 1.10–20). On or about May 22, 1999, Plaintiff, Mont–Ros, was provided with a memorandum of his light duty shift assignments which identified those shifts not already covered by the full-time communications/dispatcher personnel. (A6; A1–p. 55) The assigned shifts were alternating shifts, two days working afternoons followed by two days working midnights. (A8). Plaintiff, Mont–Ros, reported to his first scheduled light duty work on May 27 and 28, 1997 (15:00–19:00 hour shifts). He did not, however, report for his assigned light duty work on May 29, 1997 (23:00–7:00 hour shift), or any light duty work thereafter, up until the time of his termination. (A1–p. 59–60; p. 78). Upon receipt of the light duty work schedule, Plaintiff requested that the schedule be changed to allow him to work only the day or afternoon shifts and no midnight shifts—claiming that he could not work the midnight shift due to his sleep apnea condition. (A1–p.57)

On or about August 20, 1997, Daniel Kalbac, M.D., Plaintiff's treating orthopedic surgeon, notified Chief Kiel by letter that Plaintiff, Mont–Ros, had suffered "too much damage to his knees" and that he was a "good candidate for a career change and retirement from the police force." (A3–pp. 19–21; A6; A7). According- , ing to Dr. Kalbac, Plaintiff could no longer work as a police officer because, in his words, "he couldn't run after the bad guys" or "apprehend suspects." (A3–p.21–23). On or about August 27, 1997, Chief Kiel spoke with Plaintiff's treating orthopedic surgeon again and confirmed that Plaintiff was physically unable to perform duties required of a law enforcement officer. (A6) On or about August 29, 1997, after consultation with City Manager, Yolanda Aguilar, a Letter of Termination was hand delivered to Plaintiff, Mont–Ros, notifying him that he was terminated from his employment as a police officer, effective September 11, 1997.(A6) The Letter of Termination stated the reason for the termination was because Plaintiff's treating doctor notified the City that Plaintiff could not, now or in the future, perform the duties of a police officer (A6; A11).

Defendant states that Plaintiff was not permitted to continue working in a light duty capacity as a communications officer or dispatcher for the following reasons: a) Plaintiff had not been hired for the position of communications officer or dispatcher which is a lower paying civilian position; and, b) The City of West Miami is a small department with only fifteen (15) budgeted police officer positions and, to allow Plaintiff, Mont–Ros, to continue working in a light duty capacity as a dispatcher, at a police officer's pay, would have effectively left the department short one road patrol

officer. (A6) Further, allowing Plaintiff to Continue in a light duty capacity as a dispatcher would have interfered with the schedules of those employees who were working and had been hired in that capacity and required those employees to give up their days or nights off, to the extent Plaintiff wanted to work only day shifts. (A6; A1–p. 57). At the time of Plaintiff's termination, there were only three (3) dispatchers employed at the Department. (A6) Dr. Kalbac, Plaintiff's orthopedic surgeon, testified that although Plaintiff is incapable of working as a police officer because of his knee injury, he is physically capable of working in some other field such as a ticket taker, security guard, etc. (A3–pp.28–30).

Plaintiff admits that from the time that he was diagnosed with sleep apnea in July 1993 up until the time he was assigned light duty work as a dispatcher, the City never denied him shifts. (A1– p. 71). Plaintiff also admits that the City accommodated his schedule both for participation in the sleep study in July 1993 (A1–p.66), and paid for both the sleep study and the nasal Constant Positive Air Pressure (CPAP) machine proscribed to alleviate his sleep apnea (A1–p. 38; p. 66, 1.19). Plaintiff, but for the knee condition, was capable of working as a police office or dispatcher. His only claim is that he was unable to work midnight shifts as a dispatcher because of his sleep apnea. (A1–p.54).

In 1997, Plaintiff filed a worker's compensation claim related to his work related left knee injury and claimed that he was "totally disabled" and could no longer work as a police officer. (A1 –pp. 84–84) Plaintiff also admits that he applied for and began receiving Social Security Disability Insurance (SDDI) benefits and "total disability" benefits from the State of Florida Retirement System in 1997. (A1–p.50). Plaintiff concedes that as of August 20, 1997, he was totally disabled as a result of his knee injuries and unable to work as a police officer. (A1–p.84, 1.7).

Defendant now moves for summary judgment on plaintiff's ADA claim (count I), retaliation claim (Count II), and shotgun pled hostile environment claim (¶ 17 of Count I). The court held oral argument in this case on February 11, 2000. For the following reasons, the court grants summary judgment on all counts.

## II. Summary Judgment Standard[3]

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. Sept.1997). The moving party has the burden to establish the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Tyson Foods, Inc.*, 121 F.3d at 646. Once the moving party

3. Plaintiff misstates the applicable standard on summary judgment. On page three of his memorandum of law, he cites to the court a paragraph that states the standard for a motion to dismiss. In his conclusion, plaintiff again states "the Court must presume all factual allegations of the Complaint to be true and make all reasonable inferences in favor of the non-moving party." On summary judgment the court is not to accept as true the factual allegations of the complaint, but the court must instead resolve all disputed material issues of fact in favor of the non-moving party. The court will proceed under the appropriate summary judgment standard set forth below.

has established the absence of a genuine issue of material fact, to which the non-moving party bears the burden at trial, it is up to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Issues of fact are genuine only if a reasonable jury, considering the evidence presented could find for the nonmoving party. *Anderson,* 477 U.S. at 247–51, 106 S.Ct. at 2510–11. In determining whether to grant summary judgment, the district court must remember that, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* 477 U.S. at 255, 106 S.Ct. at 2513.

The Eleventh Circuit has recently taken notice of a dispute in this circuit regarding the proper standard for determining whether plaintiff has presented sufficient evidence to establish a prima facie case of employment discrimination. *Griffin v. GTE Florida, Inc.,* 182 F.3d 1279, 1281–82 (11th Cir.1999). Some courts have said that "[a]t the summary judgment stage, [the plaintiff] bears the burden of coming forward with sufficient evidence to create genuine issues of material fact regarding each of th[e] elements [of the prima facie case]." *Harris v. H & W Contracting Co.,* 102 F.3d 516, 523 (11th Cir.1996). Other courts have supported the proposition that a plaintiff must prove each element of the prima facie case by a preponderance of the evidence in order to survive summary judgment. *See Jones v. Gerwens,* 874 F.2d 1534, 1538 (11th Cir.1989). Although the Eleventh Circuit did not decide in *Griffin* which standard was the correct standard to apply, the court notes that its conclusion that plaintiff has not established a prima facie case is valid under either standard.

### III. Plaintiff's ADA Claim (Count I)

▬▬ To be eligible for relief under the ADA, a plaintiff must satisfy the same evidentiary burdens demanded by similar statutes addressing claims of employment discrimination. *See Hilburn v. Murata Electronics North America, Inc.,* 181 F.3d 1220, 1226 (11th Cir.1999). A crucial ingredient in all actions alleging discriminatory treatment by an employer based on conduct proscribed by the ADA, is proof of discriminatory motive. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 325 n. 5, 97 S.Ct. 1843, 1854 n. 5, 52 L.Ed.2d 396 (1977). In establishing unlawful motive, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). In this case, the issue is whether the City intentionally discriminated against Mont–Ros on the basis of a disability.

▬▬ To establish a case of intentional discrimination, a plaintiff may rely on direct or circumstantial evidence. The court's examination of evidence in the record reveals no direct evidence of disability-based disparate treatment. Mont–Ros has not identified specific comments or incidents which can be considered unambiguous examples of discrimination, and plaintiff does not argue that this is a direct evidence case. Accordingly, the court will analyze the case under the burden shifting framework established for circumstantial evidence cases set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

▬▬ Once plaintiff establishes his prima facie case, defendant's burden on rebuttal is to produce a legitimate, non-discriminatory reason for the challenged employment decision. *See McDonnell Douglas Corp. supra.* This burden is merely one of production, not persuasion, and is exceedingly light. *See Burdine,*

450 U.S. at 254, 101 S.Ct. at 1094; *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 773 (11th Cir.1982).

■ Once defendant satisfies this burden of production, in order to prevail upon his claims, plaintiff must establish both that the proffered reason for the employment decision was false and that the real reason for the action was discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515–17, 113 S.Ct. 2742, 2751–52, 125 L.Ed.2d 407 (1993); *Isenbergh v. Knight– Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 441 (11th Cir.1996).

### A. Plaintiff's Prima Facie Case Under the ADA

■ A prima facie case of employment discrimination based on a disability under the ADA is established by demonstrating that Mont–Ros: (1) has a disability; (2) is qualified, with or without reasonable accommodations, to perform the essential functions of his job; (3) identified for the City a reasonable accommodation; and (4) was unlawfully discriminated against because of his disability. *See Willis v. Conopco, Inc.,* 108 F.3d 282, 283 (11th Cir.1997). Mont–Ros must satisfy all elements of a prima facie case under the ADA in order to discharge his burden. The court finds that Mont–Ross has failed to point to sufficient evidence in the record to satisfy the first element—that he has a disability.

■ To satisfy the first element of a prima facie case of discrimination, Mont–Ros must demonstrate that he has a disability under the ADA. The ADA defines "disability" to include: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *see also Harris v. H & W*

*Contracting Co.,* 102 F.3d 516, 518–20 (11th Cir.1996). Merely having a physical impairment is insufficient to be covered by the ADA. *See Gordon v. E.L. Hamm & Assoc., Inc.,* 100 F.3d 907, 911 (11th Cir. 1996); *cert. denied,* 522 U.S. 1030, 118 S.Ct. 630, 139 L.Ed.2d 610 (1997). Rather, to constitute a disability, "the impairment [must] substantially limit one or more of the individual's major life activities." *Id.*

The Court notes at the outset that it is extremely unclear from plaintiff's briefing under which of the definitions of disability plaintiff is proceeding. His complaint lends no clues and his memorandum of law in opposition to defendant's motion for summary judgment merely restates the quoted language from the ADA without informing the court which definition applies to his case. Plaintiff apparently proceeds only on the assertion that his impairment limits the major life activity of breathing and working. The court cannot find an argument from the plaintiffs that he was disabled because he had a record on the impairment or that he was regarded as having the impairment. *See, e.g., Swain v. Hillsborough County School Board,* 146 F.3d 855, 857 (11th Cir.1998) (where the court noted that the plaintiff made no argument that she satisfied the second or third prong of the definition and therefore analyzed the claim only on the first prong). The court need not, however, reach the issue of which prong to use because he fails to show that his impairment substantially limits one of his major life activities.

■ According to the Supreme Court, consideration of whether Mont–Ros has a disability involves three initial steps. *See Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998). The court must first determine whether Mont–Ros has an impairment. *See id.* Next, the court must identify the life activity which Mon–Ros claims has been sub-

stantially limited and determine whether it constitutes a major life activity under the ADA. *See id.* Finally, by "tying the two statutory phrases together," the court must determine "whether the impairment substantially limit[s] [Mont–Ros's asserted] major life activity." *Id.* Determining whether a claimed impairment constitutes a disability and whether an identified endeavor constitutes a major life activity under the ADA are questions of law for the Court. *See id.*

■■ The text of the ADA does not define "impairment." However, courts may seek guidance from the EEOC regulations issued to implement Title I of the ADA.[4] Pursuant to these regulations, a physical or mental impairment is:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or physical disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h) (1998) (emphasis added). Not all covered impairments are enumerated within the regulation. It is meant to be "a representative list of disorders and conditions constituting physical impairments, including such diseases and conditions as orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, and

... drug addiction and alcoholism." *Bragdon,* 118 S.Ct. at 2202 (citation omitted).

Nor does the ADA define what constitutes "major life activities" and "substantial limitations." However, according to the EEOC's implementing regulations, "major life activities" are those "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); *see also Bragdon,* 118 S.Ct. at 2205. An impairment is "substantially limiting" when the individual is:

(i) unable to perform a major life activity that the average person in the general population can perform; or

(ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.20(j)(1).

■■■ If the asserted impaired function is not contained within the EEOC's enumerated exemplars of major life activities, courts must analyze the significance of the particular activity within the meaning of the ADA. *See Bragdon,* 118 S.Ct. at 2205 ("the touchstone for determining an activity's inclusion under the statutory rubric is its significance"). In determining whether a disability qualifies as a substantial limitation of a major life activity, courts are to consider: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long term impact of or resulting from the im-

---

4. Congress directed the EEOC to promulgate regulations to implement the provisions of Title I of the ADA. *See* 42 U.S.C. § 12116.

pairment." *Gordon,* 100 F.3d at 911 (emphasis added).

 Mont–Ros has identified his impairment as sleep apnea[5], a condition that can cause severe difficulties in breathing while asleep. *See* Gonzalez Depo. at 6. The breathing difficulties result in an unsatisfying, restless sleep, and as a result, sleep apnea sufferers tend to be excessively tired during the day. *See id.* The condition may also produce irritability, changes in personality, and difficulty with concentration. *See id.* Not every illness qualifies as an ADA disability, even if the disease is life-threatening. *See, e.g., Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 190 (5th Cir.1996) (breast cancer, that required chemotherapy and treatment which caused the plaintiff to experience significant side effects, did not qualify as a disability); *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 60 (4th Cir.1995) (HIV and other sicknesses are not *per se* disabilities; courts must rely on specific evidence showing how the disease affected the plaintiff's daily activities). Determining whether an impairment meets the ADA's standard of "disability" must be evaluated in the context of how the claimed impairment affects the employee. *See, e.g., Runnebaum v. NationsBank of Md., N.A.,* 123 F.3d 156, 166 (4th Cir.1997) ("the statute's individualized focus contemplates a case-by-case determination of whether a given impairment substantially limits one or more of the major life activities of the individual"); *Taylor v. Principal Fin. Group, Inc.,* 93 F.3d 155, 164 (5th Cir.1996) ("The determination of

whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.").

In his memorandum of law in opposition to summary judgment, Mont–Ros completely failed to engage in a step by step analysis of whether his impairment is a disability. Plaintiff does not engage in the extensive legal analysis required for the court to determine whether plaintiff's sleep apnea qualifies as a disability under the ADA. Plaintiff states in a conclusory fashion that his sleep apnea limits his major life activities of breathing and working. *See* Opposition Memo. at 11. The only case plaintiff cites to support his contention that his sleep apnea is a disability under the ADA is *Kelly v. Drexel University,* 94 F.3d 102 (3rd Cir.1996). The case is not particularly illuminating because the plaintiff in *Kelly* claimed his disability was an inability to walk, not an inability to breathe or to work. Moreover, the court in *Kelly* found that the plaintiff was not disabled under the ADA. *See id.* at 109.

### 1. Major Life Activity—Working

At oral argument, the court attempted to clarify with the plaintiff which major life activities he is claiming have been limited. Plaintiff told the court that the only life activity he is proceeding under is breathing. Plaintiff is not claiming that his sleep apnea limits his major life activity of working.[6] Because, until the oral argument, it was unclear from plaintiff's briefing wheth-

---

5. Mont–Ross does not argue that his disability is his knee injury. The court specifically questioned plaintiff's counsel "what is the disability that you are traveling under ...?" Plaintiff's counsel responded that "his disability is sleep apnea which is a cessation of breathing." To be absolutely clear, the court again asked if this has anything to do with his knees, and the plaintiff responded that it did not.

6. THE COURT: What major life activity has plaintiff's sleep apnea substantially limited?
 MR. GARCIA: His ability to sleep properly because the sleep apnea condition, what it does is not allow him to breath at nighttime.
 THE COURT: So you are not claiming that the major life activity that he is not able to do is work?
 MR. GARCIA: No. The disability is the major life activity that he is not able to do which

er he was proceeding under a theory that his major life activity of working was limited, the court will analyze the argument below.

The court concludes that as a matter of law, plaintiff's claim that he is limited in the major life activity of working must fail. The Supreme Court has called into question whether "working" is a major life activity at all. *Sutton,* 119 S.Ct. at 2151 ("We note, however, that here may be some conceptual difficulty in defining 'major life activities' to include work, for it seems 'to argue in a circle to say that if one is excluded, for instance, by reason of [an impairment, from working with others] ... then that exclusion constitutes an impairment, when the question you're asking is, whether the exclusion itself is by reason of handicap.' "). Even assuming working is a major life activity, plaintiffs claim fails.

■■■ When the major life activity under consideration is that of working, the statutory phrase "substantially limits" requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs. *Sutton,* 119 S.Ct. at 2151. Reflecting this requirement, the EEOC uses a specialized definition of the term "substantially limits" when referring to the major life activity of working:

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. § 1630.2(j)(3)(i).

The EEOC further identifies several factors that courts should consider when determining whether an individual is substantially limited in the major life activity of working, including the geographical area to which the individual has reasonable access, and "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area, from which the individual is also disqualified." §§ 1630.2(j)(3)(ii)(A), (B). To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. *Sutton,* 119 S.Ct. at 2151. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. *See id.* Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs. *See id.*

■■■ Plaintiff has failed to allege or demonstrate that he is unable to work in a broad class of jobs. In fact the evidence in the record demonstrates the contrary. The essence of plaintiff's contention that he is disabled because he is limited in the major life activity of working is that he was unable to work the midnight shift when he was assigned to light duty as a dispatcher. The inability to work a certain shift, without more, is insufficient to constitute a disability. *See, e.g., Colwell v. Suffolk County Police Dept.,* 158 F.3d 635, 644–45 (2d Cir.1998) (That police officer's doctor imposed certain restrictions on his work schedule following his cerebral hemorrhage, including that he work days only and only indoors, that his overtime be limited to certain hours, that he not work late tours or rotating shifts, and that he avoid stress and confrontation, was insufficient to establish that he was significantly restricted in his ability to work at a class or broad range of jobs and thus was "substantially limited" in major life activity of working and disabled under ADA); *Amos v. Wheelabrator Coal Services, Inc.,* 47 F.Supp.2d. 798, 803 (N.D.Texas 1998) (because plaintiff could do a wide variety of

is breathe during regular hours of sleep time.

jobs, including heavy labor, and because only his ability to do rotating shift work was impaired, plaintiff was not a disabled person entitled to recover under the ADA); *Korzeniowski v. ABF Freight Systems, Inc.*, 38 F.Supp.2d 688, 693 (N.D.Ill.1999) (inability to work rotating shifts is not a disability where innumerable jobs are available that do not involve rotating shifts); *Williams v. City of Charlotte, N.C.*, 899 F.Supp. 1484 (W.D.N.C.1995) (where the court rejected plaintiff's claim that her "shift work sleep disorder" did not substantially interfere with her major life activity of working since the sleep disorder did not impose a "significant barrier to employment" at numerous non-night shift jobs). The point is that "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *See* 29 C.F.R. § 1630.2(j)(3)(i).

 Plaintiff does not argue that the City should have returned him to a position as a police officer, instead plaintiff's only argument is that the City should not have assigned him to midnight shifts.[7] Regardless, plaintiff concedes that he was "able to perform other light-duty jobs within the police department such as police dispatcher, training advisor or report writer." Plaintiff's Response at 7. Accordingly, the court concludes that plaintiff is not "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes," and therefore, he is not disabled because of a substantial limitation in the major life activity of working.

7. Q: So that I understand your claim of your discrimination, is the first incident where you believe you were treated differently because of your disability, was that the May 1997 scheduling of your light-duty work?
MONT–ROS: Yes.
Mont–Ros Depo. at 65.
 Q: Was there anything unusual about being scheduled for light-duty work after you had been released to work?
MONT–ROS: No. My only problem with the schedule was the midnight shift.

Indeed, as indicated above, plaintiff conceded the argument at the oral argument. Finally, plaintiff's brief indicates that he is abandoning the argument that he was disabled because he could not work a midnight shift in favor of an argument that he was disabled because he could not breathe properly. *See* Plaintiff's Response at 12 ("City argues that Plaintiff is not disabled because he has not shown how his sleep apnea impairs his ability to work. However, City's argument is without merit. The E.E.O.C. Compliance Manual clearly states that if a person is substantially limited in a major life activity other than working, then no analysis of the impairment's impact on the person's work is needed."). The court therefore turns to an analysis of whether the plaintiff was disabled because of a substantially limited ability to breathe.

### 2. Major Life Activity—Breathing

Plaintiff contends that the sleep apnea substantially limits his major life activity of breathing. Once again, plaintiff makes this claim in a conclusory fashion, without citing any case law or engaging in a legal analysis.[8] On review of the record, it appears that plaintiff could attempt to satisfy the first prong of his prima facie case under a theory that his major life activity of breathing was substantially limited by his sleep apnea. *See, e.g., Silk v. City of Chicago*, 194 F.3d 788, 798–99 (7th Cir. 1999) (sleep apnea affected the major life activities of breathing and sleeping and was sufficiently severe to qualify as a dis-

Mont–Ros Depo. at 56.

8. Although plaintiff never alleged that his major life activity that was substantially limit was his ability to sleep, because his sleeping and breathing problems seem to be tied together in this case, the court will will assume plaintiff is proceeding under either of these life activities.

ability under the ADA); *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir.1999) ("We hold that sleep is a major life activity[.] ... Sleeping is a basic activity that the average person in the general population can perform with little or no difficulty, similar to the major life activities of walking, seeing, hearing, speaking, breathing, learning, working, sitting, standing, lifting, and reaching."); *Knorr v. Pepsico Food Services, Inc.*, No. 97–CV–1819 (NPM), 1999 WL 200685, * (N.D.N.Y.1999) (sleeping is a major life activity).

In determining whether a disability qualifies as a substantial limitation of a major life activity, courts are to consider: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long term impact of or resulting from the impairment." *Gordon*, 100 F.3d at 911 (emphasis added). The problem with plaintiff's case, for purposes of summary judgment, is that plaintiff has failed to adduce evidence that his sleep apnea was sufficiently "severe" such that it substantially limited his major life activity of sleeping or breathing. Although plaintiff states in his memorandum that "[p]laintiff's treating doctors testified that his condition was severe and such conditions could be life threatening," when the court looks at the portions of Dr. Gonzalez's depositions cited to support plaintiff's assertion, it is apparent that Dr. Gonzalez was not speaking about the plaintiff specifically. Dr. Gonzalez was providing background information about the disease. Significantly, Dr. Gonzalez also notes that sleep apnea "is an interesting condition that varies in severity from very mild asymptomatic snoring to severe snoring and extremely restless sleep with extreme daytime hypersomnolence or excessive sleepiness during the day." Gonzalez Depo. at 6–7. The problem is that it is unclear from the record where plaintiff

falls in the range of severity. None of plaintiff's citations to the record show whether plaintiff's sleep apnea is substantial. It is important for the record to reflect the severity of plaintiff's impairment because the ADA requires an individualized inquiry. *See Sutton*, 119 S.Ct. at 2147 ("[W]hether a person has a disability under the ADA is an individualized inquiry."); 29 CFR pt. 1630, App. § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."). Not only must the court consider whether the impairment is severe, but whether the impairment is severe despite mitigating measures the plaintiff is using.

On July 22, 1999, the United States Supreme Court addressed the ADA's disability definition provision, concluding "that the determination of whether an individual is disabled should be made with reference to measures that mitigate the individual's impairment." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 2143, 144 L.Ed.2d 450 (1999). Writing for the majority in *Sutton*, Justice O'Connor rejected prior EEOC and Justice Department interpretations of the ADA directing that mitigating measures not be taken into account when determining whether an individual is disabled, explaining:

> Looking at the Act as a whole, it is apparent that if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures—both positive and negative—must be taken into account when judging whether that person is "substantially limited" in a major life activity and thus "disabled" under the Act.

*Id.* —— U.S. at ——, 119 S.Ct. at 2146; *see also Albertson's, Inc. v. Kirkingburg*, 527

U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999); *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 119 S.Ct. 2133, 2137, 144 L.Ed.2d 484 (1999). Specifically, "[a] person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity." *Sutton*, 527 U.S. at 480, 119 S.Ct. at 2146. Thus, the court must assess the significance of the particular activity allegedly impaired in light of the activity's importance to Mont–Ros.

▮▮▮▮▮ Plaintiff has failed to offer any evidence to demonstrate that his alleged condition was an impairment of a severe, extended duration, or involved a Substantial permanent impact. Rather, Plaintiff simply asserts that he was diagnosed with a condition known as sleep apnea in July 1993, for which he underwent a sleep study, and that the condition worsened in May 1997.[9] Complaint ¶¶ 12–13. "A physical condition, however, does not automatically qualify as a 'disability' simply because it is documented in a medical study, diagnosed by a doctor, or capable of being medically treated." *See, e.g., Williams v. City of Charlotte*, 899 F.Supp. 1484 (W.D.N.C.1995) (sleep shift disorder not an impairment which qualifies as a disability); and *Taylor v. Blue Cross Blue Shield of Texas*, 1999 WL 451339, 4 (N.D.Tex.1999) (sleep apnea successfully reversed with nasal CPAP machine is not an impairment which qualifies as a disability).

Moreover, Plaintiff cannot demonstrate that his sleep apnea condition "substantially limit[ed] one or more of [his] major life activities" as required under the ADA. Plaintiff has not proffered any evidence that he was incapacitated in any manner— either at work or in his daily activities—

since his diagnosis of sleep apnea in July 1993. Plaintiff testified that he has worked as a police officer assigned to road patrol for the City from 1986 until his termination in August 1997. (A1–p.22) Plaintiff also testified that, in addition to his regular duties as a police officer, he was assistant firearms instructor in 1996 and firearms instructor in 1997. (A1–pp.30) In addition, Plaintiff was instrumental in the creation, operation, and teaching of a jujitsu program sponsored by the City called, "Cops, Kids and Kicks," from 1993 until 1998. (A1–p.32). As such, Plaintiff's own testimony belies any claim that he was substantially limited either at work or in his daily activities because of his sleep apnea condition.

Additionally, Plaintiff's sleep apnea condition is treatable and can be corrected with either of the following: (1) weight loss, (2) use of a nasal CPAP machine, and/or (3) the UPPP surgical procedure (uvulopalatopharyngoloplasty). (A4–pp. 7–1; A5–pp. 11–12). Plaintiff's treating doctors all concur that his sleep apnea condition is directly related to his obesity; and, that with a weight reduction program and the use of a nasal CPAP machine, Plaintiff's sleep apnea condition and the resulting daytime drowsiness can be alleviated. (A4–p. 7, 1.5; A5–p. 12, 1.12; p. 24, 1.11). Dr. Hugo Gonzalez testified that, much like the use of glasses to correct ones vision, the use of the nasal CPAP machine at night will alleviate Plaintiff's condition during sleeping hours and, thus, reduce the daytime drowsiness. (A4–pp.28–29). Dr. Pimentel, Plaintiff's primary care doctor, testified that she did not believe Plaintiff's sleep apnea condition substantially limited or prevented him from working as a police officer. (A5–p. 24, 1.10; p. 27, 1.6). Thus, because Plaintiff's sleep apnea condition is treatable and can be corrected

9. Plaintiff's claim that his sleep apnea condition worsened in May 1997 is unsupported by the evidence and, interestingly, allegedly occurred at or around the same time period when he was assigned light duty work as a "fill-in" dispatcher with some night shifts scheduled. (A8)

with the use of a CPAP machine at night, Plaintiff cannot demonstrate that he is "substantially limited in a major life activity."

## B. Plaintiff Has Failed to Show Defendant's Legitimate, Non–Discriminatory Reason is Pretext

Even assuming plaintiff can establish a prima facie case, defendant has articulated a legitimate non-discriminatory reason for its inability to accommodate the plaintiff's request for light-duty work. Plaintiff has completely failed to show defendant's reason is pretextual.

### 1. Defendant's Legitimate, Non–Discriminatory Reason

█ Through the affidavit of Patrick O. Kiel, the Chief of Police of the City of West Miami, defendant articulated its non-discriminatory reasons for failing to accommodate plaintiff's shift change requests. On May 20, 1997, plaintiff was released to light-duty work and the Chief assigned him to light duty work as a fill-in dispatcher to work dispatch shifts that were open due to shortage of personnel. Aff. at ¶ 8. Mont–Ros was therefore assigned shifts that were not covered by full-time dispatchers. *See id.* at ¶ 9. Mont–Ros reported to his first scheduled light duty work on May 27 and 28, 1997 but failed to report to any subsequent shifts. *See id.* On August 27, 1997, the Chief spoke with plaintiff's treating orthopedic surgeon and confirmed that because of damage to his knees, plaintiff could no longer perform the duties required of a law enforcement officer. *See id.* at ¶ 11–12. Plaintiff was therefore terminated because he could no longer perform the duties of a police officer. *See id.* at ¶ 13–14. Plaintiff was not allowed to continue working in a light duty capacity as a dispatcher because plaintiff had not been hired for the position of dispatcher, a lower paying civilian position.

*See id.* at ¶ 15. Additionally, the City of West Miami has only 15 budgeted police officer positions. *See id.* To allow the plaintiff to continue on light duty as a dispatcher at a police officer's pay would have left the department short one road patrol officer. *See id.* Finally, at the time of plaintiff's termination, there were only three dispatchers employed at the department, and to require the employees to rearrange their schedules and give up days or nights off to allow plaintiff to work light duty was not feasible. *See id.* at ¶ 16.

█ A defendant's burden of persuasion in rebutting the inference created by the prima facie case is "exceedingly light," *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir.1983), but the defendant's explanation must be "clear and reasonably specific." *Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1499 (11th Cir.1985).

█ The City's justification for failing to accommodate plaintiff's shift requests is both clear and specific. "The employer's burden is production not persuasion.... The ultimate burden remains at all times with the plaintiff." *Watkins v. Sverdrup Technology, Inc.*, 153 F.3d 1308, 1314 (11th Cir.1998). "To this aim, plaintiff's ensuing burden of proving [that the employer's proffered explanation is pretextual] merges with the plaintiff's ultimate burden of proving that [pregnancy] was a determining factor in his discharge, and it can be met by showing that a discriminatory reason more likely than not motivated the employer's decision, or by discrediting the employer's proffered explanation." *Id.* "Under this latter approach, plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find [all those reasons] unworthy of credence." *Id.*

### 2. Plaintiff Has Failed to Show Pretext

█ Once a defendant articulates a legitimate, non-discriminatory reason for

its action, the initial inference of discrimination "drops" from the case. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). The burden then shifts back to the plaintiff to discredit the defendant's proffered explanations for its decision and show that the defendant intentionally discriminated against him. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). A plaintiff may avoid summary judgment and show pretext directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir. 1997). The plaintiff has the opportunity to come forward with evidence, including the previously-produced evidence establishing the prima facie case, sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Id.; McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825.

▆▆▆ In plaintiff's entire memorandum of law, he devotes only a couple of sentences considering whether defendant's explanations were pretext. Plaintiff states that "it was a regular practice of the city" to make a dispatcher position a police officer position. Plaintiff cites to the deposition of Mercy Mont–Ros to support this statement.[10] Plaintiff also argues that previously injured police officers have held the dispatcher position for long periods of time. To support this statement, plaintiff cites to his own deposition. In his deposition, he states that he believes that Sergeant Samuel Hall, who lost an eye or had a problem with an eye, was put on the day shift doing nothing but clerical work.

(A1–p.82). This statement is not sufficiently concrete to raise an inference of pretext. Plaintiff has not shown that a clerical position was available or that the Sergeant Hall's situation was similar to his own.

▆▆▆ Moreover, the City had no obligation under the law to accommodate plaintiff in this manner and plaintiff cannot demonstrate that the City's failure to do so was unreasonable. "The ADA seeks only to provide qualified disabled employees with opportunities equal to their non-disabled co-workers; it does not demand that employers give disabled employees priority in hiring and reassignment over non-disabled employees." *See Schwertfager v. City of Boynton Beach,* 42 F.Supp.2d 1347, 1363 (S.D.Fla. 1999) (citing *Daugherty v. City of El Paso,* 56 F.3d 695, 700 (5th Cir.1995)). "An employee is not entitled to [his] preferred accommodation, only one that is reasonable." *Id.* at 1363. Moreover, an employer is not required to create a light duty position for a plaintiff where none is available. *See, e.g., Sutton v. Lader,* 185 F.3d 1203 (11th Cir.1999) (employer not required to create a light duty position for plaintiff who worked as a construction analyst where there were no light duty construction analyst positions available); *Terrell v. USAir,* 132 F.3d 621 (11th Cir.1998) (no duty to place disabled employee in part time position where none existed and no duty to create such a position). "There is no obligation under the Act to employe people who are not capable of performing the duties of the employment to which they aspire." *Id.* at 1211; *see also Shiring v. Runyon,* 90 F.3d 827, 831 (3d Cir.1996) ("employers are not required to create positions specifically for the handicapped employee"); *Carter v. Tisch,* 822 F.2d 465, 467 (4th Cir.1987) (Rehabilitation Act permits employer to release a disabled or injured employee who

10. The court notes that plaintiff has not attached the deposition of Mercy Mont–Ros to his memorandum of law. In fact the only

depositions the court has are those provided by the defendant.

cannot perform all of his duties); *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) (Rehabilitation Act does not require employer to change job requirements or ignore the fact that the plaintiff could not perform them).

■ Plaintiff has also not shown that the City was required to allow him to move from being a police officer to a light duty dispatcher position despite the fact that the job descriptions in the record, as well as plaintiff's own deposition testimony, show that the two positions are completely different. Indeed, "[t]he law is clear that reallocation of job duties constitutes a change in the essential functions of [the employee's] job and [therefore] is not required under the ADA." *Fussell v. Georgia Ports Auth.,* 906 F.Supp. 1561, 1571 (S.D.Ga.1995) (citing *Otis v. Canadian Valley–Reeves Meat Co.,* 884 F.Supp. 446, 449 (W.D.Okl.1994)); *see also Champ v. Baltimore County,* 884 F.Supp. 991, 999 (D.Md.1995) ("An accommodation is unreasonable if it requires elimination of an essential duty.").

■ Finally, plaintiff states "[f]urthermore, City's position that its actions were legitimate and nondiscriminatory is pretextual." Pl. Response at 9. The piece of evidence used to support this statement is an assertion that "[a]t a commissioners' meeting, a plaque honoring the program was discovered in the bathroom stall." *Id.*[11] Once again, it is unclear what plaintiff would like to court to make of this assertion. Plaintiff does not describe the relationship between a bathroom stall at a commissioners' meeting and his work hours. The apparent relationship the plaintiff expects the court to glean from the record is that there was some kind of animus against the plaintiff from political leaders. The plaintiff explains that his wife is the daughter of a current commissioner, Tania Rozio. The commissioner is a political enemy of the current Mayor of West Miami. Plaintiff claims that the reason he got the shift assignment he was given and the reason the City did not accommodate his request for day shifts was because the order came from the Mayor as a way to get back at plaintiff's mother-in-law. Plaintiff states that although he does not have proof, he believes politics was the real reason why he did not get the reassignment he desired. Even if the court accepts plaintiff's explanation as true, then it is conclusive proof that he was not discriminated against "because of" his disability. He was discriminated against because of political reasons. While this kind of discrimination may be morally wrong, it does not violate the ADA.

Plaintiff has failed to present competent evidence to suggest that the City's reasons for its decisions not to accommodate him for his sleep apnea condition in his light duty work as a dispatcher and its ultimate decision to terminate the Plaintiff were in any manner pretextual. In fact, plaintiff admits that the City was very accommodating with respect to allowing him to work day and afternoon shifts from the time that he was diagnosed with sleep apnea in July 1993 up until the time he was assigned light duty work as a dispatcher in May 1997. (A1–p.71). Plaintiff never requested any accommodation for his sleep apnea condition to fulfill his job requirements as a police officer. Rather, plaintiff requested an accommodation for his condition with respect to his light duty assignment as a "fill-in" dispatcher. (A1–39). Specifically, plaintiff wanted the City to permit him to continue to perform light duty work as a dispatcher, at police officer's pay, despite his admitted inability to

---

11. Once again, plaintiff cites to the deposition of Mercy Mont–Ros which has not been provided to the court.

work as a police officer. (A1–pp. 39; 84). Plaintiff asserts that allowing him to work as a dispatcher, a civilian position, and giving him seniority over all dispatchers with respect to shifts would have been a reasonable accommodation under the circumstances. (A1–p.39).[12]

Any claim of failure to accommodate Plaintiff as a police officer is further belied by his own admissions at deposition; that from the time that he was diagnosed with sleep apnea in July 1993 up until the time he was assigned light duty work as a dispatcher, the City never denied him shifts. (A1–p.71). The City in fact accommodated his schedule after his participation in a sleep study in July 1993, and the City paid for both the sleep study and the nasal CPAP machine proscribed to alleviate his sleep apnea (A1–p. 38; p. 66, 1.19). In addition, Plaintiff repeatedly testified in his deposition that he was physically capable of performing his job as a police officer despite his sleep apnea condition. *See also Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 882 (6th Cir.1996) (summary judgment for employee on failure to accommodate claim because plaintiff admitted that she did not request any accommodation and that she could perform the functions of her job). Accordingly, plaintiff has failed to show that the City's reasons for failing to accommodate his light duty schedule were pretextual. In fact, the City arguably went beyond the call of duty to accommodate him while he was a police officer by paying for his sleep study and buying him the CPAP breathing machine. To the extent that plaintiff believes he was not accommodated because of political reasons, the assertion only serves to further weaken his claim that he was discriminated against because of his disability.

12. Even assuming the City had a duty to allow plaintiff to take a light duty position, Plaintiff has not shown why he should be given priority over the seniority of civilian dispatchers in selecting shifts. *See Eckles v.*

The court therefore concludes that plaintiff has failed to show defendant's legitimate, non-discriminatory reason for not giving the plaintiff the day shifts he desired was a pretext for discrimination.

## IV. Plaintiff's ADA Retaliation Claim (Count II)

 Plaintiff also claims in count II, that he was retaliated against for having complained of the alleged discrimination. The ADA provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ... under [the ADA]." 42 U.S.C. § 12203(a). This prohibition on retaliation under the ADA is similar to Title VII's prohibition on retaliation. Accordingly, ADA retaliation claims are assessed under the same framework as for retaliation claims arising under Title VII. *Standard v. A.B.E.L. Services,* 161 F.3d 1318 (11th Cir.1998); *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278 (11th Cir.1997) (citing *McNely v. Ocala Star–Banner Corp.,* 99 F.3d 1068, 1075–77 (11th Cir.1996) (relying on Title VII jurisprudence to interpret meaning of ADA provisions in a retaliation case), cert. denied, 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1028 (1997)).

 To establish a prima facie case of retaliation, a plaintiff must show: (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action. *See Standard, supra.* Once a prima facie case is established, the burden then shifts to the defendant employer to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation.

*Consolidated Rail Corp.,* 890 F.Supp. 1391, 1407–13 (S.D.Ind.1995) (other employees do not have to be 'bumped,' nor does a bona fide seniority system have to be disrupted, in order to accommodate an ADA plaintiff).

*See Stewart, supra.* The plaintiff must then demonstrate that it will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation. *Id.* Additionally, to satisfy the first element of the prima facie case, an employee must have a good faith, objectively reasonable belief that his activity is protected by the statute. *See, e.g., Clover v. Total Sys. Servs., Inc.,* 157 F.3d 824, 827 (11th Cir.1998) (employee claiming retaliation for opposing employer's conduct must have good faith, objectively reasonable belief that such conduct was unlawful under Title VII); *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1122 (5th Cir.1998) (employee claiming retaliation for filing EEOC complaints had reasonable belief that employer violated the ADA and ADEA).

In the present case, plaintiff argues that the filing of his EEOC charge of discrimination on July 15, 1997, regarding the City's denial of an accommodation with respect to the "light duty" work he was assigned because of his knee injury constituted statutorily protected activity.

 Assuming that Plaintiff makes out a prima facie case of retaliation, the City has met its burden of proffering legitimate, nondiscriminatory reasons for the employment action taken. Clearly by the evidence articulated, the City has met its burden of coming forth with legitimate, nondiscriminatory reasons for the alleged adverse actions. As discussed above, the City explains that plaintiff's employment was terminated after Chief Kiel received a letter from Dr. Kalbac that it was "for [Mont–Ros's] his best interest that he not go back to duty as a patrol officer," that he has too much damage to his knee, and that he "would be a good candidate for a career

change and retirement from the police force." Kalbac Letter of August 20, 1997. Keil spoke to Kalbac again on August 27 and confirmed that plaintiff was unable to perform his duties as a law enforcement officer. Plaintiff was sent a termination letter two days later which cited as the reason for termination, plaintiff's inability to perform the duties of a police officer because of his injury. Aside from the temporal proximity of plaintiff's filing of his EEOC complaint, plaintiff has produced no other evidence that his termination was retaliation. As the court explained above, Plaintiff has not shown that the City had a duty to keep him on light-duty work, keep him employed as a police officer, or "medically retire" him. Plaintiff also has not shown that other police officers who were injured and unable to complete their duties as police officers were given permanent clerical or dispatcher jobs. Accordingly, plaintiff's retaliation claim must fail.

### V. Plaintiff's Hostile Environment ADA Claim[13]

Plaintiff has pled in shotgun fashion a hostile environment claim in paragraph 17 of his complaint stating "[f]urthermore, City unreasonably interfered with Plaintiffs [sic] work performance, creating an intimidating, offensive, and hostile working environment." It is unclear whether plaintiff intended to state a hostile environment claim. Defendant moved, in an abundance of caution, to dismiss the claim on summary judgment, and plaintiff did not address the arguments in his memorandum of law. The court therefore assumes plaintiff has abandoned the claim because he did not present evidence or arguments to oppose summary judgment. The court will however, examine whether plaintiff has a claim for hostile environment disability harassment.

---

**13.** The Eleventh Circuit has never expressly recognized a claim for disability-based harassment under the ADA. However, for pur-

poses of this Motion, Defendant will assume that such claim for relief exists.

Disability-based hostile environment claims are analyzed under the Title VII standards for hostile work environment claims. *See Haysman v. Food Lion, Inc.*, 893 F.Supp. 1092 (S.D.Ga.1995). *Cf. Rio v. Runyon*, 972 F.Supp. 1446, 1458 (S.D.Fla.1997). To set forth a prima facie case of hostile work environment, the Plaintiff must establish: (1) that he is a member of a protected class; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based on the protected characteristic; (4) that the harassment affected a term or condition of employment; and (5) that the employer knew or should have know of the harassment and failed to take prompt, remedial action. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (citing *Henson v. City of Dundee*, 682 F.2d 897, 903–05 (11th Cir.1982)); *Edwards v. Wallace Community College*, 49 F.3d 1517 (11th Cir.1995). Additionally, "to be actionable the harassment must be so severe and pervasive as to 'have the purpose or effect of unreasonably interfering with [Plaintiff's] work performance or creating an intimidating, hostile or offensive environment.'" *Schwertfager, supra.* (citing, *Meritor, supra.*).

To survive summary judgment on a hostile work environment claim, a plaintiff must produce enough evidence that a reasonable jury could find that his workplace was permeated with "discriminatory intimidation, ridicule, and insult ... sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Meritor, supra.* A plaintiff must establish more than the "mere utterance of an ... epithet which engenders offensive feelings in an employee" to establish a violation of Title VII and, in turn, the ADA. *Id.* at 67, 106 S.Ct. 2399. A plaintiff must establish that in light of all of the circumstances, the working environment was both subjectively and objectively abusive. Factors to consider include: "the frequency of the discriminatory conduct; its severity; whether it is threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 22, 114 S.Ct. 367.

In this case, plaintiff cannot establish that his work environment was "hostile" in violation of the ADA. Here, plaintiff contends that the Sgt. Gary Knowles and two other fellow police officers subjected him to unwelcome harassment based on his alleged disability, sleep apnea, on a few occasions after his diagnosis. Specifically, Plaintiff claims that one time Sgt. Gary Knowles approached him at the shooting range and asked him, in a demeaning manner, "how could you [he] fall asleep at a shooting range." (A1–p.48, 1.20). In addition, Officers Ferrar and Jimenez followed him on one or two occasions allegedly in order to catch him falling asleep. (A1–p.48, 1.12). No other instances of harassment are alleged in the four year period from the time he was diagnosed in July 1993 until his termination in August 1997. (A.1–73–76).

These isolated incidents, which are arguably offensive, are not sufficient to meet the standard for claims of harassment on the basis of a disability. The conduct described is not "so severe or egregious" as to create an objectively hostile work environment. Indeed, courts have granted summary judgment to employers in harassment cases where the plaintiff's evidence of harassment was much more severe than that alleged by Mont–Ros in this case. *See, e.g., Henry v. Guest Servs., Inc.*, 902 F.Supp. 245 (D.D.C.1995), *aff'd*, 98 F.3d 646 (D.C.Cir.1996) (granting summary judgment for employer because jokes about employee suffering from de-

pression were not severe or pervasive as a matter of law); *Chua v. St.Paul Fed. Bank for Sav.*, 5 A.D.Cas. (BNA) 786, 788–89, 1996 WL 34458 (N.D.Ill.1996) (granting employer summary judgment for employer where co-employees repeatedly made fun of employee's limp because harassment was not sufficiently severe or pervasive as a matter of law); *Rodriguez v. Loctite Puerto Rico, Inc.*, 967 F.Supp. 653, 665–666 (D.P.R.1997) (granting summary judgment for employer because employer questioning severity of employee's medical condition, telling employee she did not like her smile and intimating employee could be fired for that reason, preventing photographer from delivering picture to employee, suggesting employee had taken another employee's turkey and giving employee unsatisfactory evaluation, were not sufficiently severe or pervasive as a matter of law).

No reasonable interpretation would lead a jury to conclude that these isolated comments permeated the West Miami Police Department with "discriminatory intimidation, ridicule, and insult ... sufficiently severe of pervasive to alter the conditions of [plaintiff's] employment and create an abusive working environment." *See Meritor, Edwards, and Henson, supra.* Given the paucity of incidents and the arguable offensiveness of the alleged conduct over a four year period, as a matter of law, it cannot be said that plaintiff Mont–Ros suffered abuse so "severe or pervasive" so as to alter the "terms, conditions or privileges" of his employment.

Accordingly, the court grants summary judgment in favor of the City on Plaintiff's disability-based hostile work environment claim.

**WHEREFORE, IT IS ORDERED THAT:**

1) Defendant's motion for summary judgment (DE# 19) is GRANTED in all respects.

2) Plaintiff shall take nothing from this action.

3) This case is hereby DISMISSED and CLOSED.